648 F.Supp. 195 (1986)
NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, FREDERICK COUNTY CHAPTER, An Unincorporated Association, et al.
v.
Michael C. THOMPSON, Zoning Administrator of Frederick County, Maryland, Winchester Hall.
Civ. No. K-85-3512.
United States District Court, D. Maryland.
October 6, 1986.
*196 Willie J. Mahone, Frederick, Md., Patricia E. Butler, and Michael A. Millemann, Baltimore, Md., for plaintiffs.
Lawrence E. Speelman, Co. Atty., and Joseph E. Emerson, Deputy Co. Atty., Frederick, Md., for defendant.
FRANK A. KAUFMAN, Senior District Judge.
Plaintiffs are the Frederick County Chapter of the National Association for the Advancement of Colored People (NAACP); the Chapter President, Lord D. Nickens; and JoAnne Evans-Anderson, a black woman, who is Director of Community Relations for the Maryland Human Relations Commission.[1] Defendant is the Zoning Administrator (Administrator) of Frederick County, Maryland (County).[2] On May 15, 1985, the Ku Klux Klan (Klan) applied to *197 the Administrator for a permit to use private property in the County for a Klan rally to be held on August 17, 1985. On June 12, 1985, the Administrator issued that permit. On August 15, 1985, the original[3] plaintiffs filed this suit, seeking, inter alia, a temporary restraining order declaring the permit void. Following a hearing on August 17, 1985, plaintiffs withdrew their request for a restraining order, and amended their complaint to seek a permanent injunction barring the Administrator from issuing permits for future Klan rallies not open to all members of the public. Subsequently, plaintiffs have been permitted further to amend their complaint.[4]

FACTS
The parties have stipulated as follows, without thereby conceding relevancy or materiality of such facts:
1. Section 1-19-213 of the Frederick County Zoning Ordinance, enacted in September, 1981, requires that a person must obtain a Temporary Use Permit from the Frederick County Zoning Administrator prior to holding a public rally or public gathering on non-institutional use private property. Public rallies and gatherings are defined in the Ordinance as those open to at least a segment of the general public.
2. On June 12, 1985, acting pursuant to this Ordinance, the then Frederick County Zoning Administrator, Frederick Lowndes, issued to Roger Kelly a Temporary Use Permit for a public Ku Klux Klan ("Klan") rally to be held on the evening of August 17, 1985, on his father's property, approximately 11¼ acres, in a rural area of Frederick County near Rocky Ridge, Maryland. Lowndes concedes that he learned of the Klan's plans to exclude all non-whites from the public rally on June 28th, two weeks after the issuance of the permit. Lowndes had issued permits for five similar public Klan rallies that were, on their faces, discriminatory. Those permits specified that the public rallies were open "to white gentile persons only." These permits were issued for public rallies on June 28, 1980; October 18, 1980; April 4, 1981; July 25, 1981; and September 19, 1981. They were issued pursuant to the then existing Permit Ordinance, which is different from the present one.
3. The last public rally, held on August 17, 1985, was permitted pursuant to the presently effective Zoning Ordinance, § 1-19-213(a). The present permit ordinance is facially neutral as regards race. The ordinance was enacted on September 23, 1981 as a result of the recommendation of an ad hoc advisory committee appointed by the Frederick County Commissioners to study problems with public rallies and other gatherings. Plaintiff Lord Nickens was a member of the committee. The Frederick County Commissioners also designated June 28, 1980 as "Brotherhood Day" in Frederick County to counteract the discriminating practice of the Ku Klux Klan.
4. Condition number 7 states: "The issuance of this permit shall in no way be construed as the approval of any Frederick County Governmental Agency or official of the purpose of the meeting or of the organization holding the activity."[5]
5. The Ku Klux Klan ("Klan") is an organization comprised of individuals who promote and practice racial discrimination. The Klan's policy of excluding all non-whites from public and private rallies is codified in its constitution, bylaws and operating procedures. The Klan's discriminating practices and policies are a matter of general public knowledge in Frederick County and Mr. Lowndes was aware of these practices and policies, which have been the subject of numerous articles in the Frederick and Hagerstown newspapers.
*198 6. The public rallies serve as a forum for the dissemination of the Klan's political and religious views and as a mechanism for the solicitation of new members. Speeches by individual Klansmen promoting the Klan's discriminatory racial and religious views are the focus of the public rallies.
7. Klan members actively solicit media coverage of the rallies. Newspaper and television reporters and photographers are routinely permitted to attend public Klan functions. Reporters have been present for virtually all of the public Klan rallies, and in each case have published or broadcast stories about the rallies. Klan members grant interviews to newspaper reporters in which they discuss their plans for upcoming public rallies.
8. Since June, 1980, there have been at least six (6) public Klan rallies in Frederick, County, open to whites only, at which all non-whites have been excluded. These were:
(a) The June 28, 1980 public rally (closed to non-whites) in Braddock Heights, Maryland.
(b) The October 18, 1980 public rally (closed to non-whites) in Braddock Heights, Maryland.
(c) The April 4, 1981 public rally (closed to non-whites) in Braddock Heights, Maryland.
(d) The July 25, 1981 public rally (closed to non-whites) in Braddock Heights, Maryland.
(e) The September 19, 1981 public rally (closed to non-whites) in Braddock Heights, Maryland.
(f) The August 17, 1985 public rally (closed to non-whites) in Rocky Ridge, Maryland. (This is the only Klan public rally that has been held under the new Temporary Use Permit Ordinance that has been in effect since September 1981).
More specifically, on June 28, 1980 a black woman JoAnne Evans-Anderson, was refused permission to attend a public Klan rally in Braddock Heights by an armed Klansman, who told her no blacks were permitted to attend the rally. She was excluded by a white male Klansman "dressed in army fatigues and carrying a rifle". As she was leaving the rally, she overheard another white man dressed in army fatigues telling a black television reporter that he would have to leave because the public rally was closed to non-white persons. In September, 1981, Klansmen excluded an Asian-American photographer, Sam Yu, who was sent by United Press International to cover the public Klan rally in Braddock Heights.
9. As noted above, Klansmen armed with rifles and semi-automatic guns enforce the Klan's discriminatory policies, escorting all non-whites off the property who attempt to attend a public Klan rally. The exclusions are visible to all who attend these rallies, including State Police and Frederick County Deputy Sheriffs.
10. At Klan public rallies, approximately 35 State Police troopers and 15 Frederick County Deputy Sheriffs were, and are routinely assigned to monitor Klan functions, to assist with traffic control, ensure compliance with the conditions of the permit, and to maintain the peace. It is the policy of both the State Police and the Frederick County Sheriff's Department to refrain from interfering with the exclusion of non-whites from public Klan rallies, so long as there is no breach of the peace. In accordance with that policy, no State trooper or Frederick County Deputy Sheriff has ever intervened, or otherwise taken any action to prevent the exclusion of non-whites at any of the public Klan rallies noted above or any other that they have monitored. Frederick County has no control or authority over the Maryland State Police.
11. The most recent public Klan rally took place as scheduled on the evening of August 17, 1985. Some of the Klansmen present at the rally were armed with rifles and semi-automatic weapons. Several representatives from the news media were present to cover the event, including representatives from WMAR-TV in Baltimore (Channel 2), the Frederick News Post and the News American. However, Klan members refused to allow Jocelyn Maminta, an *199 Asian-American reporter from television station WDVM in Washington, D.C., to attend the public rally because she was non-white. Ms. Maminta was escorted off the property by armed Klansmen. Approximately six State troopers and an equal number of Deputy Sheriffs were stationed around the perimeter of the property in their usual fashion to assist with traffic control and to maintain the peace. Consistent with previous practice, no State trooper nor Deputy Sheriff intervened to prevent the exclusion of Ms. Maminta. The property in question was private property, an eleven (11) acre farmette owned by the father of the permittee.
12. Under the Maryland Constitution, Article IV, § 44, the sheriff of each county is elected by the voters for a term of four years "to exercise such powers and perform such duties as now or may hereafter be fixed by law."
13. The parties stipulate to the truth and accuracy of all the facts contained herein and the allegations contained in the Affidavits in support of Plaintiffs' cross-Motion for Summary Judgment. However, no party concedes the relevancy or materiality of these facts.
(Emphases added).
Another such rally was apparently held on August 16, 1986 in accordance with a permit seemingly issued by the Administrator in June or July, 1986 pursuant to the 1981 ordinance. No details as to what occurred during that rally have been made known to this Court by the parties or their counsel.
The 1981 ordinance is a type of statutory provision designed to require advance governmental authorization and insure traffic and police planning and supervision, in order to try to prevent the kind of traffic problems on public roads leading to the private property on which a public rally is held and the kind of crowd-control problems on such private property, which occurred not too many years ago in connection with a rock music concert open to the public and held on private property in or near Woodstock, New York.
In the within case, the 1981 Frederick County ordinance at issue provides in pertinent part:
(a) An application must be made for a temporary use permit which may be issued by the zoning administrator for all of the following outdoor activities to which are invited or are open to a segment of the general public: namely carnivals, circuses, tent revival meetings, musical festivals, public gatherings, public rallies, dinners, sales, bazaars, and similar activities in all zoning districts, except residential wherein temporary use permits shall not be issued.... (Outdoor shall include activities in a tent, pavilion or open-type permanent structures.) Before issuing a permit, the zoning administrator shall determine that the site is adequate for its intended temporary use according to the following:
(1) The proposed activity is in compliance with all safety, health, and environmental standards, and is not detrimental to the surrounding area.
(2) The site is of a sufficient size to accommodate the intended temporary use.
(3) A buffer zone devoid of all activities of one hundred (100) feet from all adjacent property lines will be maintained.
(4) Safe and orderly traffic can be ensured.
(Emphases added).
In the context of those stipulated facts, the factual background in this case seems rather clear.[6] The NAACP is an organization dedicated to the achievement of racial equality. Its Frederick County Chapter includes some black members, who plaintiffs have alleged,
... if they were allowed to do so, would seek to, and would attend Ku Klux Klan *200 rallies in the future that Defendant authorize[d] by permit pursuant to the Frederick County Zoning Ordinance. ("Public Klan rallies"). NAACP members would attend these public Klan rallies, among other reasons, to present their views, and the views of the NAACP, in favor of racial integration to the representatives of television stations and print media who attend, and report on these public Klan rallies.
Plaintiffs have also alleged:
Nickens, if he were allowed to, would seek to, and would attend public Ku Klux Klan rallies in the future that are authorized by Defendant by permit pursuant to the Frederick County Zoning Ordinance. He would attend these public Klan rallies, among other reasons, to present his views in favor of racial integration, and similar views of the NAACP, to the representatives of television stations and print media who attend, and report on these public Klan rallies. He has not attempted to attend such public Klan rallies in the past because, among other reasons, he knew that non-whites had been, and would be excluded from these public Klan rallies by armed Klansmen.
JoAnne Evans-Anderson is a black woman who is Director of Community Relations for the Maryland Human Relations Commission. She has held that position since 1979. Her duties as Directory of Community Relations include monitoring the activities of extremist groups, including the various factions of the Maryland Ku Klux Klan. She planned to attend a public Klan rally in Braddock Heights, Maryland on Saturday, June 28, 1980. The rally was to be held on property, adjacent to the Braddock Heights Fire Hall. At approximately 6:00 p.m. on the evening of the rally, she arrived at the State Police look-out point near the Fire Hall. She spoke to State Police Officers for a few minutes and then walked alone onto the property on which the public Klan rally was being held; she walked in the direction of speakers' platform. She was stopped by a white male dressed in army fatigues and carrying a rifle. He told M's Evans-Anderson that she could not attend the public Klan rally because "no blacks were allowed." As she was leaving the property, she overheard another white man dressed in army fatigues telling a black television report[er] that he would have to leave because the rally was closed to non-white persons. From time to time in the future, M's. Evans-Anderson, if she were allowed to do so, would seek to, and would attend public Ku Klux Klan rallies that are authorized by permit pursuant to Section 1-19-213 of the Frederick Zoning Ordinance for the purposed of monitoring the activities of the Ku Klux Klan. She has not attempted to attend public Klan rallies in Frederick County in the past, other than the June 28, 1980 one, because, among other things, she knew non-whites had been, and would be excluded from these public Klan rallies by armed Klansmen.
Plaintiffs' Motion to Amend Second Amended Complaint.
Additionally, plaintiffs have alleged that Seaven Gordon, a black male resident of Frederick County, Maryland who is Vice President of the NAACP, Frederick County Chapter, has stated that he would attend future Klan rallies after June 6, 1985 if he could because, inter alia, he would then be able to report on such rallies to the NAACP and others. See Plaintiffs' Motion to Amend Second Amended Complaint, Affidavit of Seaven Gordon.
The application for the August 17, 1985 permit indicated that the "[i]ntended use [of the] property [is] for KKK rally on August 17, 1985." The application for the rallies in June 1980, April 1981 and July 1981 read respectively, in pertinent part, as follows:
June 1980
Recruiting rally for Ku Klux Klan; open for white, gentile persons; cross-burning ceremony.
April 1981

*201 To hold Rally on Saturday, April 4, 1981 between the hours 7:30-10:30 p.m. for cross lighting  open to white gentile persons only.
July 1981
To hold rally on Saturday, July 25, 1981 between the hours 7:30-10:30 p.m. for cross lighting  open to white gentile persons only.

STANDING
At the threshold the question arises as to whether plaintiffs have standing.[7] In Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), Justice Rehnquist wrote:
We need not mince words when we say that the concept of "Art III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, nor when we say that this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-paragraph definition. But of one thing we may be sure: Those who do not possess Article III standing may not litigate as suitors in the Courts of the United States.
Id. at 475-76, 102 S.Ct. at 760 (footnote omitted).
Earlier in that opinion the Justice had commented:
The term "standing" subsumes a blend of constitutional requirements and prudential considerations, see Warth v. Seldin, 422 U.S. 490, 498 [95 S.Ct. 2197, 2204, 45 L.Ed.2d 343] (1975), and it has not always been clear in the opinions of this Court whether particular features of the "standing" requirement have been required by Art III ex proprio vigore, or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution. See Flast v. Cohen, 392 U.S., [83] at 97 [88 S.Ct. 1942, at 1951, 20 L.Ed.2d 947 (1968)].
A recent line of decisions, however, has resolved that ambiguity, at least to the following extent: at an irreducible minimum, Art III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).
Id. at 471-72, 102 S.Ct. at 757-58 (footnote omitted).
Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S., at 499 [95 S.Ct., at 2205]. *202 In addition, even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. Id., at 499-500 [95 S.Ct., at 2205]. Finally, the Court has required that the plaintiffs complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Orgs. v. Camp, 397 U.S. 150, 153 [90 S.Ct. 827, 829, 25 L.Ed.2d 184] (1970).
Id. at 474-75, 102 S.Ct. at 759-60 (footnotes omitted).
In Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), Chief Justice Burger, in holding that a Washington state agency had standing to challenge the constitutionality of a North Carolina statute regulating the sale of apples, wrote:
[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.
Id. at 343, 97 S.Ct. at 2441.
"[A]n organization whose members are injured may represent those members in a proceeding for judicial review." Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), citing NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963). See also NAACP v. Alabama, 357 U.S. 449, 458-60, 78 S.Ct. 1163, 1169-70, 2 L.Ed.2d 1488 (1958). Herein the NAACP and the individual plaintiffs, Mr. Nickens and Ms. Evans-Anderson, have alleged "injury in fact," see Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), and have stated complaints which meet "the Art. III requirement of actual or threatened injury amenable to judicial remedy." Valley Forge Christian College, supra 454 U.S. at 475, 102 S.Ct. at 760. Each of these individuals has alleged a desire to attend, or has in fact attempted to attend, one or more of the Klan rallies held on private property in Frederick County and has demonstrated or explained specifically why each of them desired to be present at such rallies. The basic purpose of the NAACP itself reveals the nature of its interest and the interests of its members in not being excluded from such events open to all members of the public except non-whites and non-gentiles. Accordingly, all of the plaintiffs herein have standing to challenge the constitutional validity of the grant of a permit of the type issued by the Administrator on June 12, 1985.

STATE ACTION
The term "state action" includes action by a subdivision of a state, such as Frederick County. "[A]ll problems relating to the existence of government action  local, state or federal  which would subject an individual to constitutional restrictions come under the heading of `state action.'" J. Nowak, R. Rotunda & J. Young, Constitutional Law, 498 (2d ed. 1983).
Herein plaintiffs do not challenge the constitutionality of the Frederick County Zoning Ordinance itself. Indeed they agree that the ordinance is facially neutral as regards race.[8] Nor do plaintiffs challenge the Klan's right to hold private, members-only, segregated meetings on private property. Rather plaintiffs contend that the exclusion of individuals from a public rally on private property which is *203 authorized by, and may not be held without, a county-issued permit, is unconstitutional. It would seem clear that if the Administrator had issued a permit for a rally on private property, without which the rally could not be held, and that such permit itself had specifically provided that all members of the public, except nonwhites and/or non-gentiles, could attend, and that non-whites and/or non-gentiles could not attend, such action would be state action, involving discrimination against non-whites and/or non-gentiles, which would be a denial of equal protection under the fourteenth amendment to the Constitution. But what has occurred in this case does not meet that explicit factual description. Herein, acting under a facially neutral ordinance, the Administrator has issued permits, some of which specifically disclaim approval of the purpose of each of the rallies in question, and of the Klan. The added factual factors are that traffic control, crowd-control and the need for police presence in connection with the rallies has been handled by Frederick County Deputy Sheriffs and Maryland State policemen and that in the context of the same, blacks have, in fact, been excluded and escorted from the private property rally premises by private persons enforcing the Klan's said exclusionary policy, in the presence of such deputies and policemen and without any intervention by any of them. If the totality of the actions and nonactions in this case by state and county officials add up to "state action", then the County has involved itself in depriving plaintiffs of their constitutional right to be free of racially discriminatory conduct by the County. The core issue therefore is whether state action has taken place.
The County's attorneys contended in argument to this Court that neither the County, by enacting an amendment to the ordinance, nor the Zoning Administrator, by his action, could, without violating the federal Constitution, condition the grant of a permit to hold a public rally on private property so as to cause the permit holder to admit all members of the public, without reference to race or religion, to the rally. That question, as such, is not before this Court. But if the County's position is correct, then the precise issue before this Court would need to be considered in the context of the Administrator perhaps being placed in the dilemma of, on the one hand, violating the federal Constitution if he refused to grant the permit for the public rally unless the latter is open to all persons without reference to race or religion, or, on the other hand, if the County is deemed to have engaged in "state action" herein, violating the federal Constitution by issuing the permit without conditioning such issuance on nonexclusion of racial or religious minorities. In this Court's view the County's said position is not correct and the Administrator is not confronted with that dilemma because the issuance of the permit could be conditioned by him upon such public rallies being open to all persons, regardless of race or religion, without violating the federal Constitution. Defendant, however, also argues that under the limited powers granted by the State of Maryland to Frederick County, the County does not have the authority so to condition the grant of a rally permit. Assuming arguendo only that that contention has merit, the State of Maryland seemingly could, if it desired, grant the necessary power to Frederick County to enable the Administrator so to condition the grant of a permit upon lack of racial discrimination. In any event, there is no federal constitutional impediment involved in that regard.
In Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the Supreme Court, while concluding that a shopping center was not required by federal constitutional principles to permit picketing on its premises, held that the shopping center could be required to do so by federal statute. Justice Stewart wrote:
It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state....
This elementary proposition is little more than a truism. But even truisms *204 are not always unexceptionably true, and an exception to this one was recognized almost 30 years ago in Marsh v. Alabama, 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265 (1946)]. In Marsh, a Jehovah's Witness who had distributed literature without a license on a sidewalk in Chickasaw, Ala., was convicted of criminal trespass. Chickasaw was a so-called company town, wholly owned by the Gulf Shipbuilding Corp.
Id. at 513, 96 S.Ct. at 1033 (citation omitted).
It was the Marsh case that in 1968 provided the foundation for the Court's decision in Amalgamated Food Employees Union v. Logan Valley Plaza, 391 U.S. 308 [88 S.Ct. 1601, 20 L.Ed.2d 603 (1968)]. That case involved peaceful picketing within a large shopping center near Altoona, Pa. One of the tenants of the shopping center was a retail store that employed a wholly nonunion staff. Members of a local union picketed the store, carrying signs proclaiming that it was nonunion and that its employees were not receiving union wages or other union benefits. The picketing took place on the shopping center's property in the immediate vicinity of the store. A Pennsylvania court issued an injunction that required all picketing to be confined to public areas outside the shopping center, and the Supreme Court of Pennsylvania affirmed the issuance of this injunction. This Court held that the doctrine of the Marsh case required reversal of that judgment.
The Court's opinion pointed out that the First and Fourteenth Amendments would clearly have protected the picketing if it had taken place on a public sidewalk....
The Court's opinion then reviewed the Marsh case in detail, emphasized the similarities between the business block in Chickasaw, Ala., and the Logan Valley shopping center, and unambiguously concluded:
The shopping center here is clearly the functional equivalent of the business district of Chickasaw involved in Marsh. 391 U.S., at 318 [88 S.Ct., at 1608].
Upon the basis of that conclusion, the Court held that the First and Fourteenth Amendments required reversal of the judgment of the Pennsylvania Supreme Court.
Four years later the Court had occasion to reconsider the Logan Valley doctrine in Lloyd Corp. v. Tanner, 407 U.S. 551 [92 S.Ct. 2219, 33 L.Ed.2d 131 (1972)]. That case involved a shopping center covering some 50 acres in downtown Portland, Ore. On a November day in 1968 five young people entered the mall of the shopping center and distributed handbills protesting the then ongoing American military operations in Vietnam. Security guards told them to leave, and they did so, "to avoid arrest." Id., at 556 [92 S.Ct., at 2222].
Id. at 514-16, 96 S.Ct. at 1033-34 (citations omitted).
The Court in its Lloyd opinion did not say that it was overruling the Logan Valley decision. Indeed, a substantial portion of the Court's opinion in Lloyd was devoted to pointing out the differences between the two cases, noting particularly that, in contrast to the handbilling in Lloyd, the picketing in Logan Valley had been specifically directed to a store in the shopping center and the pickets had had no other reasonable opportunity to reach their intended audience. 407 U.S., at 561-567 [92 S.Ct., at 2225-2228]. But the fact is that the reasoning of the Court's opinion in Lloyd cannot be squared with the reasoning of the Court's opinion in Logan Valley.
Id. at 517-18, 96 S.Ct. at 1035 (footnote omitted).
[W]e make clear now, if it was not clear before, that the rationale of Logan Valley did not survive the Court's decision in the Lloyd case.
Id. at 518, 96 S.Ct. at 1035 (footnote omitted).
If a large self-contained shopping center is the functional equivalent of a municipality, *205 as Logan Valley held, then the First and Fourteenth Amendments would not permit control of speech within such a center to depend upon the speech's content. For while a municipality may constitutionally impose reasonable time, place, and manner regulations on the use of its streets and sidewalks for First Amendment purposes [citations omitted] and may even forbid altogether such use of some of its facilities, [citations omitted] what a municipality may not do under the First and Fourteenth Amendments is to discriminate in the regulation of expression on the basis of the content of that expression, [citation omitted]. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of Chicago v. Mosley, 408 U.S. 92 [92 S.Ct. 2286, 33 L.Ed.2d 212] (1972). It conversely follows, therefore, that if the respondents in the Lloyd case did not have a First Amendment right to enter that shopping center to distribute handbills concerning Vietnam, then the pickets in the present case did not have a First Amendment right to enter this shopping center for the purpose of advertising their strike against the Butler Shoe Company [the company whose employees re the pickets were on strike].
We conclude, in short, that under the present state of the law the constitutional guarantee of free expression has no part to play in a case such as this.
From what has been said it follows that the rights and liabilities of the parties in this case are dependent exclusively upon the National Labor Relations Act. Under the Act the task of the Board, subject to review by the courts, is to resolve conflicts between § 7 rights and private property rights, "and to seek a proper accommodation between the two." Central Hardware Co. v. NLRB, 407 U.S. [539] at 543 [92 S.Ct. 2238, at 2241, 33 L.Ed.2d 122] [1972].
Id. at 520-21, 96 S.Ct. at 1036-37 (emphasis added; footnotes omitted).
For the reasons stated in this opinion, the judgment is vacated and the case is remanded to the Court of Appeals with directions to remand to the National Labor Relations Board, so that the case may be there considered under the statutory criteria of the National Labor Relations Act alone.
Id. at 523, 96 S.Ct. at 1038.
The Kelly property is certainly more like the shopping centers involved in Logan, Lloyd and Hudgens than the company town in Marsh. Indeed, the Kelly property has many less public property attributes than do those shopping centers, since those centers were regularly and continually open to the public, while the private property in Frederick County used for the Klan rallies was only open to the public for those several rallies. Since despite the Court's holding in Hudgens that there was no constitutional right of the striking employees to picket within the shopping center, the Congress, as Justice Stewart suggests, had the constitutional authority to direct, by federal statute, the National Labor Relations Board to permit such picketing, then there would seem to be no reason why Frederick County and the State of Maryland may not, if they so desire, condition the grant of a permit to the Klan to hold a public rally upon private property upon such rally being open to all members of the public without regard to race or creed.
Further support for that view is to be found in Pruneyard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). In that case, high school students, in a "peaceful and orderly" manner, id. at 77, 100 S.Ct. at 2038, solicited support within a privately owned and operated California shopping center containing over seventy-five places of business, for their position opposing a United Nations resolution against "Zionism." The Supreme Court noted that the Supreme Court of California had held that:
[T]he California Constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the *206 centers are privately owned." [Robins v. Pruneyard Shopping Center] 23 Cal 3d 899, 910 [153 Cal.Rptr. 854, 860], 592 P2d 341, 347 (1979). It concluded that appellees are entitled to conduct their activity on Pruneyard property. In rejecting appellants' contention that such a result infringed property rights protected by the Federal Constitution, the California Supreme Court observed:
It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations ... would not markedly dilute defendant's property rights.
Pruneyard at 78, 100 S.Ct. at 2039 (citations omitted).
After citing to and discussing Logan Valley, Lloyd and Hudgens, Justice Rehnquist wrote in Pruneyard:
Our reasoning in Lloyd, however, does not ex proprio vigore limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. [Citations omitted]. In Lloyd, supra, there was no state constitutional or statutory provision that had been construed to create rights to the use of private property by strangers, comparable to those found to exist by the California Supreme Court here. It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision.
Pruneyard at 81, 100 S.Ct. at 2040 (citations omitted).
It may well be that Mr. Kelly, by opening his private farm property to the public for a Klan rally did not bestow upon attendees of that rally any right to speak during that rally or to require the Klan to call upon anyone to speak at the rally other than as the Klan desired. But, herein, plaintiffs do not seek the opportunity to speak at such a rally; rather, plaintiffs complain herein of being excluded entirely from attending such Klan rallies.
In Pruneyard Justice Rehnquist further wrote:
It is true that one of the essential sticks in the bundle of property rights is the right to exclude others. Kaiser Aetna v. United States, 444 U.S. 164, 179-80 [100 S.Ct. 383, 392-93, 62 L.Ed.2d 332] (1979). And here there has literally been a "taking" of that right to the extent that the California Supreme Court has interpreted the State Constitution to entitle its citizens to exercise free expression and petition rights on shopping center property. But it is well established that "not every destruction or injury to property by governmental action has been held to be a `taking' in the constitutional sense." Armstrong v. United States, 364 U.S. 40, 48 [80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554] (1960). Rather, the determination whether a state law unlawfully infringes a landowner's property in violation of the Taking Clause requires an examination of whether the restriction on private property "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Id., at 49 [80 S.Ct. at 1569]. This examination entails inquiry into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations. Kaiser Aetna v. United States, 444 U.S., supra, at 175 [100 S.Ct., *207 at 390]. When "regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 [43 S.Ct. 158, 160, 67 L.Ed. 322] (1922).
Id. at 82-83, 100 S.Ct. at 2041 (footnotes omitted).
In the light of that analysis Justice Rehnquist concluded that there had been no unconstitutional taking in Pruneyard and held that the California Court's decision did not deny to the shopping center owners "their property without due process of law." Id. at 84, 100 S.Ct. at 2042. In Pruneyard, Justice Rehnquist also rejected the contention "that a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others," id. at 85, 100 S.Ct. at 2042 (footnote omitted), commenting:
[T]he shopping center by choice of its owner is not limited to the personal use of appellants. It is instead a business establishment that is open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner. Second, no specific message is dictated by the State to be displayed on appellants' property. There consequently is no danger of governmental discrimination for or against a particular message. Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law.
Id. at 87, 100 S.Ct. at 2044.
In the within litigation no governmental agency has prescribed the need for any speaker to say or not say or to do or not do anything on or with regard to the private property. But, "by choice of its owner," the property was, on the occasion of each Klan rally, made "open to the public." Having made that "choice," the private property owner cannot complain that he has been deprived of his privacy, or of his freedom to use his own private property as he desires, if he is required not to discriminate among the members of the public by excluding all persons belonging to a particular race or to a particular religious group. A private property owner can surely invite whomever he selects to attend a private gathering on his property. But when he offers his private property to the public, he has placed himself in a position which enables the government, if it so desires, to impose certain requirements upon him. If, as in Pruneyard and in Hudgens, a state or federal statute can require a shopping center owner to permit certain solicitation or picketing within the shopping center, then there would appear no federal constitutional barrier to Frederick County requiring the Klan to hold an open-to-all, non-racially, non-religiously discriminating, public rally on private property before issuing a permit. That view is supported, though probably not compelled, by Chief Justice Burger's comment in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723] (1973):
[A]lthough the Constitution does not proscribe private bias, it places no value on discrimination as it does on the values inherent in the Free Exercise Clause. Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but is has never been accorded affirmative constitutional protections. And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment; Congress has made such discrimination unlawful in other significant contexts.10
10 See, e.g., Griffin v. Breckenridge, 403 U.S. 88 [91 S.Ct. 1790, 29 L.Ed.2d 338] (1971); Jones v. Alfred H. Mayer Co., 392 U.S. 409 [88 S.Ct. 2186, 20 L.Ed.2d 1189] (1968); 42 U.S.C. §§ 2000a et seq. [42 U.S.C.S. §§ 2000a et seq.] (barring discrimination in public accomodations); 42 U.S.C. §§ 2000e et seq. [42 U.S.C.S. *208 §§ 2000e et seq.] (barring discrimination in private employment); 42 U.S.C. §§ 3601 et seq. [42 U.S.C.S. § 3601] (barring discrimination in private housing transactions).
Id. at 469-70, 93 S.Ct. at 2812-13.
Norwood presented the question of whether the State of Mississippi could supply text books to students "in both public and private schools, without reference to whether any participating private school has racially discriminatory policies." Id. at 456, 93 S.Ct. at 2806. Answering that question in the negative, the Supreme Court in Norwood required a "school-by-school" examination to determine which private schools could receive the state aid. In so concluding, the Chief Justice wrote:
[T]he Constitution does not permit the state to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination.

Id. at 465-66, 93 S.Ct. at 2810-11 (emphasis added). While Norwood arose in a different factual and legal context than is presented herein, the Chief Justice's comment about state action having a "significant tendency to facilitate, reinforce and support private discrimination" and his statement that "[i]nvidious private discrimination ... has never been accorded affirmative constitutional protections," id. at 470, 93 S.Ct. at 2813, seems strongly to support the conclusion that Frederick County, if it wished, could, without violating the federal Constitution, condition the issuance of permits to hold public rallies upon private property upon a non-discriminating, open-to-all requirement. Accordingly, the question of whether the County must proscribe such conduct when it issues such a permit will be considered herein on the basis that the County is permitted by the federal Constitution so to do.
Analysis of that "must" question can perhaps best be approached by consideration, next, of the use of public property for rallies of the type the Klan has held on the Kelly property, as opposed to the use of private property for such purposes.
In National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973), after the Arlington County, Virginia School Board had refused to permit the Party to use a high school auditorium for a meeting during non-school hours, the Party brought suit to compel the Board to permit such use. The district court dismissed the complaint, holding inter alia, that "the Board could not accommodate the party without involving the state unconstitutionally in the Party's racially discriminatory practices." Id. at 1012. Judge Winter, writing for the Fourth Circuit, reversed. In so doing he noted that the Board's conduct with respect to other non-school groups had resulted in the auditorium being partially dedicated as a public forum, id. at 1014-15, and that "the first amendment protects from state interference the expression in a public place of the unpopular as well as the popular and the right to assemble peaceably in a public place in the interest and the furtherance of the unpopular as well as the popular." Id. at 1015 (footnotes omitted). Judge Winter also wrote that "the state action doctrine is not applicable where a group seeks to exercise first amendment rights in a public forum dedicated to that purpose," id. at 1017, and then summarized his holdings as follows:
First, political organizations are entitled to first amendment protections, including the use of facilities for meetings and other appropriate purposes. (Citation omitted). Secondly, the use of facilities partially dedicated as a public forum for the expression of diverse views does not amount to state espousal of racist views, whether they are merely expressed or whether they are expressed by a group which implements them by racist membership policies.
Id. at 1017.
In Ringers, however, the factual predicate of the majority opinion, authored by Judge Winter, was that while the party discriminated in its membership policies, *209 the public meetings held by the Party were open to all members of the public, regardless of race.[9] Judge Winter seemingly suggested that had the Party discriminated as to attendance of its public meetings, the Board would not have been required to permit the Party to use school facilities, writing:
Perhaps a difference may exist where as a result of the discriminatory membership policy, the public building is open for use only on a discriminatory basis. But here, although the Party does not admit Negroes to membership, the proposed March 7 meeting was open to the public at large.
Id. at 1018 (footnote omitted).
In Cason v. City of Jacksonville, 497 F.2d 949 (5th Cir.1974), the National State's Rights Party sought to use the city's Civic Auditorium for its annual convention. Plaintiff, a black woman, sought an injunction prohibiting the use of the auditorium by the Party. The district court granted the injunction on the basis of the Party's discriminatory membership policies. Id. at 950-51. Chief Judge Brown, noting that the record did not disclose "whether this meeting was a purely private one or one to be open to the public," id. at 953 (footnote omitted), remanded the case for a determination of that factual question, and wrote "[i]f the [district] court finds that the meeting would have in fact been open to nonmembers but limited to the white public at large, we can say without reservation that the district court's injunction would have been entirely proper." Id. at 954.
In Knights of the Ku Klux Klan, Realm of Louisiana v. East Baton Rouge Parish School Board, 578 F.2d 1122 (5th Cir.1978), Judge Gee concluded that the Klan was entitled to a temporary injunction restraining the School Board from prohibiting the Klan from using school facilities for public meetings, writing that "there simply is no state involvement here in KKK's [sic] ideas or practices, whatever they may be, and no state action endorsing them." Id. at 1128. However, as Judge Gee noted, the parties had stipulated that the meeting was open to all, with no restriction as to admission of any individuals on a racial basis. Id. 1126. Judge Gee did not address the question of whether such exclusion would have resulted in a finding of state action.
Ringers, supported by Cason and Knights, would appear to teach that a state may not deny the use of public property to a group with racially discriminatory membership policies if the group's public meetings are open to the public as a whole, but also indicates that a state must deny the use of public property by such a group if the group's public meetings exclude nonwhites. However, a state's involvement in a Klan-type rally, when the use of public property is involved, is, of course, quite different than when the rally is held on private property.
In Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the Supreme Court held violative of the equal protection clause of the fourteenth amendment the judicial enforcement by state courts of covenants restricting the use or occupancy of real property to persons of the Caucasian race. Noting that such a result "could not be squared with the requirements of the Fourteenth Amendment *210 if imposed by state statute or local ordinance," id. at 11, 68 S.Ct. at 841, Chief Justice Vinson recognized:
Here the particular patterns of discrimination and the areas in which the restrictions are to operate, are determined, in the first instance, by the terms of agreements among private individuals.... The crucial issue with which we are here confronted is whether this distinction removes these cases from the operation of the prohibitory provisions of the Fourteenth Amendment.
* * * * * *
[T]he restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. [Citation omitted].
But here there was more. These are cases in which the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive terms of the agreements.
Id. at 13-14, 68 S.Ct. at 842.
Continuing, the Chief Justice, referring to the long-standing proposition that action by a state court is state action just as is action by a state's legislative and executive officials, concluded:
[B]ut for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint.
These are not cases, as has been suggested, in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell. The difference between judicial enforcement and non-enforcement of the restrictive covenants is the difference to petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing.
Id. at 19, 68 S.Ct. at 845.
In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), a privately owned and operated restaurant, which leased space from a Delaware state agency, refused to serve food or drink to a person solely because he was a Negro. Justice Clark, for a majority of five, held that the said exclusion constituted "discriminatory state action in violation of the Equal Protection Clause of the Fourteenth Amendment." Id. at 717, 81 S.Ct. at 857. The restaurant was located in downtown Wilmington, Delaware in a structure which was principally used as a parking garage with some space leased for commercial use by tenants, including the restaurant. The latter occupied space located within the "'exterior walls of the structure [with] ... no marked public entrance leading from the parking portion of the facility into the restaurant proper."' Id. at 719, 81 S.Ct. at 858. The restaurant's lease "contains no requirement that its restaurant services be made available to the general public on a nondiscriminatory basis, in spite of the fact that the Authority [the state agency  lessor] has power to adopt rules and regulations respecting the use of its facilities except any as would impair the security of its bondholders." Id. at 720, 81 S.Ct. at 859. In that context, Justice Clark wrote:

The Civil Rights Cases, 109 U.S. 3 [3 S.Ct. 18, 21 L.Ed. 835] (1883) "embedded in our constitutional law" the principle "that the action inhibited by the first section [Equal Protection Clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, *211 however discriminatory or wrongful." Chief Justice Vinson in Shelley v. Kraemer, 334 U.S. 1, 13 [68 S.Ct. 836, 842, 92 L.Ed. 1161] (1948). It was language in the opinion in the Civil Rights Cases (U.S.) supra, that phrased the broad test of state responsibility under the Fourteenth Amendment, predicting [sic] its consequence upon "State action of every kind ... which denies ... the equal protection of the laws." At p. 11 [68 S.Ct. at p. 841]. And only two Terms ago, some 75 years later, the same concept of state responsibility was interpreted as necessarily following upon "state participation through any arrangement, management, funds or property." Cooper v. Aaron, 358 U.S. 1, 4 [78 S.Ct. 1401, 1402, 3 L.Ed.2d 5] (1958). It is clear, as it always has been since the Civil Rights Cases (U.S.) supra, that "Individual invasion of individual rights is not the subject-matter of the amendment," at p. 11 [78 S.Ct. at p. 1406], and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it. Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose impression was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." Kotch v. River Port Pilot Comrs., 330 U.S. 552, 556 [67 S.Ct. 910, 912, 91 L.Ed. 1093 (1947)]. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.
Id. at 721-22, 81 S.Ct. at 859-60 (emphases added).
Analyzing the governmental operation of the building and the benefits to the governmental owner from the operation of the restaurant, Justice Clark concluded that there was present "that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn," id. at 724, 81 S.Ct. at 861, that the "good faith" of the state agency, i.e., the lack of intent or desire to discriminate, was seemingly not relevant or material, that the state agency "by its inaction ... has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination," id. at 725, 81 S.Ct. at 861, and that:
[t]he State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment. (Emphasis added).
Id. at 725, 81 S.Ct. at 861. Justice Clark stated that "nigh universal application of a constitutional precept" was not possible because the decision in each case would be so largely governed by its own facts. Id. at 726, 81 S.Ct. at 862.
In Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), petitioners, five young Negroes, entered a privately owned and operated amusement park, whose policy was to exclude Negroes, but which welcomed all other members of the public. A special policeman, privately paid by the park but deputized as a sheriff of Montgomery County, Maryland and who wore a sheriff's badge, arrested the five for trespassing, transported them to the Montgomery County police station, and charged them with criminal trespass. Subsequently, after they were convicted in the Circuit Court for Montgomery County and the Court of Appeals of Maryland affirmed their convictions, petitioners successfully sought reversal thereof in the Supreme *212 Court of the United States. In his opinion, Chief Justice Warren wrote:
If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law. [Citation omitted]. Thus, it is clear that Collins' [the deputy sheriff] action was state action. [Citations omitted]. The only question remaining in this case is whether Collins' action denied petitioners the equal protection of the laws secured to them by the Fourteenth Amendment. If it did, these convictions are invalid.
It cannot be disputed that if the State of Maryland had operated the amusement park on behalf of the owner thereof, and had enforced the owner's policy of racial segregation against petitioners, petitioners would have been deprived of the equal protection of the laws.
Id. at 135, 84 S.Ct. at 1772 (citations omitted).

It is argued that the State may nevertheless constitutionally enforce an owner's desire to exclude particular persons from his premises even if the owner's desire is in turn motivated by a discriminatory purpose. The State, it is said, is not really enforcing a policy of segregation since the owner's ultimate purpose is immaterial to the State. In this case it cannot be said that Collins was simply enforcing the park management's desire to exclude designated individuals from the premises. The president of the corporation which owned and managed the park testified that he had instructed Collins to enforce the park's policy of racial segregation. Collins was told to exclude Negroes from the park and escort them from the park if they entered. He was instructed to arrest Negroes for trespassing if they did not leave the park when he ordered them to do so. In short, Collins, as stated by the Maryland Court of Appeals, was "then under contract to protect and enforce ... [the] racial segregation policy of the operator of the amusement park...." [Citations omitted]. Pursuant to this obligation Collins ordered petitioners to leave and arrested them, as he testified, because they were Negroes. This was state action forbidden by the Fourteenth Amendment.
Id. at 136-37, 84 S.Ct. at 1773 (emphasis added).
In Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), a white school teacher from New York brought a damage suit under 42 U.S.C. § 1983, naming only Kress  and not naming any governmental official  as party defendant, for refusal to serve lunch to her in a restaurant in Hattiesburg, Mississippi, operated by a Kress store "because she was a Caucasian in the company of Negroes" and for conspiring with the Hattiesburg police to deprive her of her federal constitutional rights. In his majority opinion, Justice Harlan wrote:
Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way act to compel or encourage racial segregation.
Id. at 150-52, 90 S.Ct. at 1605-05 (emphasis added and footnote omitted).
[S]ettled practices of state officials may, by imposing sanctions or withholding benefits, transform private predilections into compulsory rules of behavior no less than legislative pronouncements.
Id. at 168, 90 S.Ct. at 1613.
For petitioner to recover under the substantive count of her complaint, she must show a deprivation of a right guaranteed to her by the Equal Protection Clause of the Fourteenth Amendment. Since the "action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States," Shelley v. Kraemer, 334 U.S. 1, 13 [68 S.Ct. 836, 842, 92 *213 L.Ed. 1161] (1948), we must decide, for purposes of this case, the following "state action" issue: Is there sufficient state action to prove a violation of petitioner's Fourteenth Amendment rights if she shows that Kress refused her service because of a state-enforced custom compelling segregation of the races in Hattiesburg restaurants?

In analyzing this problem, it is useful to state two polar propositions, each of which is easily identified and resolved. On the one hand, § 1 of the Fourteenth Amendment does not forbid a private party, not acting against a backdrop of state compulsion or involvement to discriminate on the basis of race in his personal affairs as an expression of his own personal predilections. As was said in Shelley v. Kraemer, supra, § 1 of "[t]hat Amendment erects no shield against merely private conduct, however discriminatory or wrongful." 334 U.S., at 13 [68 S.Ct. at 842].
At what point between these two extremes a State's involvement in the refusal becomes sufficient to make the private refusal to serve a violation of the Fourteenth Amendment, is far from clear under our case law. If a State had a law requiring a private person to refuse service because of race, it is clear beyond dispute that the law would violate the Fourteenth Amendment and could be declared invalid and enjoined from enforcement. Nor can a State enforce such a law requiring discrimination through either convictions of proprietors who refuse to discriminate, or trespass prosecutions of patrons who, after being denied service pursuant to such a law, refuse to honor a request to leave the premises.

The question most relevant for this case, however, is a slightly different one. It is whether the decision of an owner of a restaurant to discriminate on the basis of race under the compulsion of state law offends the Fourteenth Amendment. Although this Court has not explicitely decided the Fourteenth Amendment state action issue implicit in this question, underlying the Court's decisions in the sit-in cases is the notion that a State is responsible for the discriminatory act of a private party when the State, by its law, has compelled the act. As the Court said in Peterson v. City of Greenville, 373 U.S. 244, 248 [83 S.Ct. 1119, 1121, 10 L.Ed.2d 323] (1963): "When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby `to a significant extent' has `become involved' in it." Moreover, there is much support in lower court opinions for the conclusion that discriminatory acts by private parties done under the compulsion of state law offend the Fourteenth Amendment. In Baldwin v. Morgan [287 F.2d 750 (5th Cir.1961)], supra, the Fifth Circuit held that "[t]he very act of posting and maintaining separate [waiting room] facilities when done by the [railroad] Terminal as commanded by these state orders is action by the state." The Court then went on to say: "As we have pointed out above the State may not use race or color as a basis for distinction. It may not do so by direct action or through the medium of others who are under State compulsion to do so." Id., at 755-756 (emphasis added). We think the same principle governs here.
For state action purposes it makes no difference of course whether the racially discriminatory act by the private party is compelled by a statutory provision or by custom having the force of law  in either case it is the State that has commanded the result by its law. Without deciding whether less substantial involvement of a State might satisfy the state action requirement of the Fourteenth Amendment, we conclude that petitioner would show an abridgement of her equal protection right, if she proves that Kress refused her service because of a state-enforced custom of segregating the races in public restaurants.
Id. at 169-71, 90 S.Ct. at 1614-15 (emphases added and footnote omitted).
*214 In the within case there is neither a Frederick County statutory command nor a Frederick County or state enforced custom. Accordingly, in the absence of the same, the question posed herein is whether the issuance of the permit by the County's Zoning Administrator and the participation and patrolling by county and state law enforcement officers adds up to significantly sufficient state action to trigger the bar of the fourteenth amendment against governmental involvement in the Klan's discriminatory actions. In that regard, it is to be noted that in Adickes, Justice Harlan also commented, on remand, that one of the ways that petitioners could demonstrate enforcement of the alleged action, was as follows:
Alternatively, it might be shown on remand that the Hattiesburg police would intentionally tolerate violence or threats of violence directed toward those who violated the practice of segregating the races at restaurants.
Id. at 172, 90 S.Ct. at 1616 (footnote omitted; emphasis added). And, Justice Harlan also wrote:
In the same way that a law whose source is a town ordinance can offend the Fourteenth Amendment even though it has less than state-wide application, so too can a custom with the force of law in a political subdivision of a State offend the Fourteenth Amendment even though it lacks state-wide application.
Id. at 173, 90 S.Ct. at 1616.
The Kelly private property involved in the within case was seemingly used by the Klan only once, for the purpose of a public rally. In Adickes, the Kress restaurant in Hattiesburg was regularly open for business to the public. The record does not suggest that the Frederick County Zoning Administrator, or any Frederick County deputy sheriff, or any Maryland state policeman encouraged the Klan to exclude non-whites from any of the rallies. But, the record does show that those deputy sheriffs and state policemen intentionally tolerated such forcible exclusion by non-governmental Klan-connected or Klan-directed private bouncers, although there is no evidence herein that in so doing, Frederick County or the State of Maryland law enforcement officers enforced an area-wide custom, as was the case in Adickes. Also, in the within case, no governmental officer exercised any of his authority to enforce discrimination by his own affirmative physical actions as was the case in Griffin v. Maryland. Rather, however, there was passive supervision by the law enforcement officers of the activities of the Klan bouncers. It is also to be noted that in Adickes, the only defendant was a private party, not a government official. However, Justice Harlan made it clear in Adickes that, nevertheless, state action by Hattiesburg was involved.
In Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the would-be black guest of a Caucasian member of the local Harrisburg, Pennsylvania branch of the Moose Lodge, a national fraternal organization, sought injunctive relief against that Moose Lodge branch and the Pennsylvania Liquor Authority as defendants, alleging that the Lodge's refusal to serve food and alcoholic beverages to plaintiff in the Lodge's dining room was discriminatory state action in violation of the fourteenth amendment's equal protection principles. Plaintiff asked that the Liquor Authority be required to revoke the Lodge's liquor license for as long as the Lodge continued its discriminatory practices, including its membership policy of admitting only white male caucasians and its policy of permitting to bring to the "lodge premises, particularly to the dining room and bar," id. at 166, 92 S.Ct. at 1968, only Caucasian guests. After a three judge panel of the United States District Court for the Middle District of Pennsylvania issued an injunction against both defendants, "declaring invalid the liquor license issued to the Moose Lodge `as long as it follows a policy of racial discrimination in its membership or operating policies or practices,'" id. at 165, 92 S.Ct. at 1967, only the Moose Lodge appealed. Justice Rehnquist held that since appellee had not sought membership in the Lodge, the District Court "went *215 beyond the vindication of any claim that appellee had standing to litigate.... [in reaching the membership issue, but that] [a]ppellee did ... have standing to litigate the constitutional validity of Moose Lodge's policies relating to service of guests of members." Id. at 168, 92 S.Ct. at 1969.
Noting that Moose Lodge is a "private club," id. at 171, 92 S.Ct. at 1970, operated "in a building that is owned by it," id., and "is not publicly funded," id., and that only members and invited guests are permitted access to and use of it, Justice Rehnquist wrote:
While the principle is easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to "state action," on the other hand, frequently admits of no easy answer. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, supra [365 U.S. 715], at 722 [81 S.Ct. 856, at 860, 6 L.Ed.2d 45 (1961)].
Our cases make clear that the impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination. Shelley v. Kraemer, supra. The Court held in Burton v[.] Wilmington Parking Authority, supra, that a private restaurant owner who refused service because of a customer's race violated the Fourteenth Amendment, where the restaurant was located in a building owned by a state created parking authority and leased from the authority. The Court, after a comprehensive review of the relationship between the lessee and the parking authority concluded that the latter had "so far insinuated itself into a position of interdependence with Eagle [the restaurant owner] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so `purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S., at 725 [81 S.Ct., at 862].
The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services included such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in The Civil Rights Cases, supra, and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," Reitman v. Mulkey, 387 U.S. 369, 380, 18 L Ed 2d 830, 838, 87 S Ct 1627 [1634] (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.
Our prior decisions dealing with discriminatory refusal of service in public eating places are significantly different factually from the case now before us. Peterson v. City of Greenville, 373 U.S. 244 [83 S.Ct. 1119, 10 L.Ed.2d 323] (1963), dealt with the trespass prosecution of persons who "sat in" at a restaurant to protest its refusal of service to Negroes. There the Court held that although the ostensible initiative for the trespass prosecution came from the proprietor, the existence of a local ordinance requiring segregation of races in such places was tantamount to the State having "commanded a particular result," 373 U.S., at 248 [83 S.Ct., at 1121].
Id. at 172-73, 92 S.Ct. at 1971. (emphases added).
Police protection to enable the members of an excluded group from forcibly entering upon a private property being used for private purposes would seemingly not violate the equal protection clause. But the issue is a different one when police protection is needed in connection with a public *216 function being held upon private property pursuant to a governmental permit and under conditions which strongly indicate in advance the possible need for involvement on the part of the police. Whether such difference is sufficient in degree goes to the core of the problem in this case.
In Moose Lodge, Justice Rehnquist contrasting the facts in Burton v. Wilmington Parking Authority, with those present in Moose Lodge, commented:
Unlike Burton, the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accommodation, Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large. Nor is it located and operated in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State. In short, while Eagle was a public restaurant in a public building, Moose Lodge is a private social club in a private building.
Id. at 175, 92 S.Ct. at 1972 (footnote omitted).
[T]he Pennsylvania Liquor Control Board plays absolutely no part in establishing or enforcing the membership or guest policies of the club that it licenses to serve liquor. There is no suggestion in this record that Pennsylvania law, either as written or as applied, discriminates against minority groups either in their right to apply for club licenses themselves or in their right to purchase and be served liquor in places of public accommodation.
Id. at 175-76, 92 S.Ct. at 1972-73 (footnote omitted).
However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise.
Id. at 176-77, 92 S.Ct. at 1973 (emphasis added).
Each club license granted by the Pennsylvania Liquor Control Board required "that `[e]very club licensee shall adhere to all the provisions of its Constitution and By-Laws.'" Id. at 177, 92 S.Ct. at 1973 (footnote omitted). The constitution and by-laws of the Moose Lodge did, as indicated supra, contain, when the case was before the District Court, a restriction on membership to white male caucasians only but did not then embody any racial restriction on guests. That restriction was, however, a matter of policy and practice on the part of the local chapter of the Lodge, at the time when the case was before the federal district court. However, in the Supreme Court, Moose Lodge "conceded" that its by-laws "have been altered since the lower court decision to make applicable to guests the same sort of racial restrictions as are presently applicable to members." Id. at 178, 92 S.Ct. at 1974 (footnote omitted). Accordingly, Justice Rehnquist concluded:
Even though the Liquor Control Board regulation in question is neutral in its terms, the result of its application in a case where the constitution and bylaws of a club required racial discrimination would be to invoke the sanctions of the State to enforce a concedely discriminatory private rule. State action, for purposes of the Equal Protection Clause, may emanate from rulings of administrative and regulatory agencies as well as from legislative or judicial action. Robinson v. Florida, 378 U.S. 153, 156 [84 S.Ct. 1693, 1695, 12 L.Ed.2d 771] (1964). Shelley v. Kraemer, 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161] (1948), makes it clear that the application of state sanctions to enforce such a rule would violate the Fourteenth Amendment. Although the record before us is not as clear as one would like, appellant has not persuaded us that the District Court should have denied any and all relief.
Appellee was entitled to a decree enjoining the enforcement of § 113.09 of the regulations promulgated by the Pennsylvania Liquor Control Board insofar *217 as that regulation requires compliance by Moose Lodge with provisions of its constitution and bylaws containing racially discriminatory provisions. He was entitled to no more. The judgment of the District Court is reversed, and the cause remanded with instructions to enter a decree in conformity with this opinion.
Id. at 178-79, 92 S.Ct. at 1974 (emphasis added).
In Moose Lodge, the state-issued license commanded the licensee to adhere to its own constitution and by-laws and thus in that case required the licensee to discriminate upon racial grounds in terms of service to guests. In the within case, neither the rally permit nor any other governmental action commanded the private property owner or the Klan to bar attendees on racial or religious grounds. But the governmental actions in the within case went beyond provision of "necessities of life such as electricity, water, and police and fire services" in the same way as such services are generally provided to private property owners and/or members of the public. Herein, the governmental issuance of the permit and the police services in fact enabled a racially discriminatory public rally on private property to be held without endangering public safety. However, that alone might well not constitute state action.
The Frederick County ordinance involved in this case is neutral on its face. The applications for the permits by the Klan were known or should have been known by the Administrator to envision non-neutral and discriminatory use of the permits. The provisions of the permits did not require discriminatory racially-based exclusions of blacks from the Klan rallies, but they permitted the same. The traffic control administered by the State police enabled the rallies to be held in a manner seemingly not unsatisfactory to the State and to the County in that regard. The presence of the State police and the Frederick County deputy sheriffs apparently satisfied the perceived governmental needs for traffic control and for security to prevent disturbances and the like at and during the rallies. And the supervisory presence of such law enforcement personnel was, at the very least, a symbol of tolerance of the exclusion of blacks, physically enforced by the Klan.
In Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the termination of customer service by a utility company, allegedly without appropriate notice and hearing and opportunity to pay amounts due, was held not to be "state action" in a challenge pursuant to the due process clause of the fourteenth amendment.
The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. [Moose Lodge,] 407 U.S., at 176-77 [92 S.Ct. at 1973]. Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so. Public Utilities Comm'n v. Pollak, 343 U.S. 451, 462 [72 S.Ct. 813, 820, 96 L.Ed. 1068] (1952). It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be "state" acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. Moose Lodge No. 107, supra [407 U.S.], at 176 [92 S.Ct. at 1973]. The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met. Burton v. Wilmington Parking Authority, supra.
Id. at 350-51, 95 S.Ct. at 453 (footnote omitted).
[T]here was no such imprimatur placed on the practice of Metropolitan about which petitioner complains. The nature of governmental regulation of private *218 utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into "state action." At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State,17 does not make its action in doing so "state action" for purposes of the Fourteenth Amendment.
17 As in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173 [92 S.Ct. 1965, 1971, 32 L.Ed.2d 627] (1972), there is no suggestion in this record that the Pennsylvania Public Utility Commission intended either overtly or covertly to encourage the practice. [Citation omitted].
Id. at 357, 95 S.Ct. at 456.
Herein the Administrator did not place his imprimatur of approval or disapproval upon the Klan's discriminatory practices although the Administrator did issue the permits seemingly knowing, in each instance, that only white gentiles were going to be allowed to attend the otherwise open-to-the-public Klan rallies. Nor did the State police or the County deputy sheriffs specifically approve or disapprove of the Klan's exclusionary policy and practices, by words or actions. But the Administrator, the State police and the County deputy sheriffs did continue to permit and to tolerate those practices in a way seemingly considerably more closely connected with the commission by the Klan of its exclusionary practices than were the actions of the utility commission in Jackson with respect to the practices of the defendant utility therein.
In Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the consolidated cases presented "two basic questions: whether § 1981 prohibits private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes, and, if so, whether that federal law is constitutional as so applied." Id. at 168, 96 S.Ct. at 2593 (footnote omitted). Concluding that § 1981 was violated, Justice Stewart wrote:
[I]t may be assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions. But it does not follow that the practice of excluding racial minorities from such institutions is also protected by the same principle. As the Court stated in Norwood v Harrison, 413 U.S. 455 [93 S.Ct. 2804, 37 L.Ed.2d 723], "the Constitution ... places no value on discrimination," id., at 469 [93 S.Ct. at 2812], and while "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment ... it has never been accorded affirmative constitutional protections. And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment; Congress has made such discrimination unlawful in other significant contexts." Id., at 470 [93 S.Ct. at 2813].
Id. at 176, 96 S.Ct. at 2597. (emphasis added).
Nor is there any showing in the case at bar that the Klan will be inhibited in stating its views during public rallies on the private property in Frederick County if non-whites or non-gentiles are in attendance. Whether any members of those groups, if they should attend such rally, would have any right to speak is a question not before this Court at this time. The only reason why that question is alluded to *219 at all in this opinion is because, in affidavits filed in this case, one or more plaintiffs and/or blacks have indicated as a reason for their wanting to attend such rallies, their desire to have the opportunity for their own views to be heard. But that is not their only or seemingly primary reason. Rather, principally, such persons have stated their insistence that they not be excluded from the rallies.
In Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), "[t]he question presented by this litigation is whether a warehouseman's proposed sale of goods entrusted to him for storage, as permitted by New York [statute] is an action properly attributable to the State of New York." Id. at 151-52, 98 S.Ct. at 1731. (footnote omitted). In that case Justice Rehnquist, inter alia, reasoned as follows:
Respondent's primary contention is that New York has delegated to Flagg Brothers a power "traditionally exclusively reserved to the State." Jackson, supra [419 U.S.], at 352 [95 S.Ct., at 454]. They argue that the resolution of private disputes is a traditional function of civil government, and that the State in § 7-210 has delegated this function to Flagg Brothers. Respondents, however, have read too much into the language of our previous cases. While many functions have been traditionally performed by governments, very few have been "exclusively reserved to the State."
One such area has been elections. While the Constitution protects private rights of association and advocacy with regard to the election of public officials, our cases make it clear that the conduct of the elections themselves is an exclusively public function.
Id. at 157-58, 98 S.Ct. at 1733-34.
A second line of cases under the public-function doctrine originated with Marsh v. Alabama, 326 U.S. 501, 90 L Ed 265, 66 S Ct 276 (1946). Just as the Texas Democratic Party in Smith and the Jaybird Democratic Association in Terry effectively performed the entire public function of selecting public officials, so too the Gulf Shipbuilding Corp. performed all the necessary municipal functions in the town of Chickasaw, Ala., which it owned. Under those circumstances, the Court concluded it was bound to recognize the right of a group of Jehovah's Witnesses to distribute religious literature on its streets. The Court expanded this municipal-function theory in Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308 [88 S.Ct. 1601, 20 L.Ed.2d 603] (1968), to encompass the activities of a private shopping center. It did so over the vigorous dissent of Mr. Justice Black, the author of Marsh. As he described the basis of the Marsh decision:
The question is, Under what circumstances can private property be treated as though it were public? The answer that Marsh gives is when that property has taken on all the attributes of a town, i.e., "residential buildings, streets, a system of sewers, a sewage disposal plant and a `business block' on which business places are situated." 326 U.S. at 502 [66 S.Ct. at 276]. 391 U.S., at 332 [88 S.Ct. at 1615] (dissenting opinion).
This Court ultimately adopted Mr. Justice Black's interpretation of the limited reach of Marsh in Hudgens v. NLRB, 424 U.S. 507 [96 S.Ct. 1029, 47 L.Ed.2d 196] (1976), in which it announced the overruling of Logan Valley.
These two branches of the public function doctrine have in common the feature of exclusivity. Although the elections held by the Democratic Party and its affiliates were the only meaningful elections in Texas, and the streets owned by the Gulf Shipbuilding Corp. were the only streets in Chickasaw, the proposed sale by Flagg Brothers under § 7-210 is not the only means of resolving this purely private dispute.
Id. at 158-60, 98 S.Ct. at 1734-35 (footnote omitted).
Thus, even if we were inclined to extend the sovereign-function doctrine outside *220 of its present carefully confined bounds, the field of private commercial transactions would be a particularly inappropriate area into which to expand it. We conclude that our sovereign-function cases do not support a finding of state action here.
Our holding today impairs in no way the precedential value of such cases as Norwood v[.] Harrison, 413 U.S. 455 [93 S.Ct. 2804, 37 L.Ed.2d 723] (1973), or Gilmore v. City of Montgomery, 417 U.S. 556 [94 S.Ct. 2416, 41 L.Ed.2d 304] (1974), which arose in the context of state and municipal programs which benefited private schools engaging in racially discriminatory admissions practices following judicial decrees desegregating public school systems. And we would be remiss if we did not note that there are a number of state and municipal functions not covered by our election cases or governed by the reasoning of Marsh which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so called "dispute resolution." Among these are such functions as education, fire and police protection, and tax collection. We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment. The mere recitation of these possible permutations and combinations of factual situations suffices to caution us that their resolution should abide the necessity of deciding them.
Respondents further urge that Flagg Brothers' proposed action is properly attributable to the State because the State has authorized and encouraged it in enacting § 7-210. Our cases state "that a State is responsible for the ... act of a private party when the State, by its law, has compelled the act." Adickes, 398 U.S., at 170 [90 S.Ct. at 1615]. This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State. The Court rejected a similar argument in Jackson, 419 U.S., at 357 [95 S.Ct. at 456]:
Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action."
The clearest demonstration of this distinction appears in Moose Lodge No. 107 v. Irvis, 407 U.S. 163 [92 S.Ct. 1965, 32 L.Ed.2d 627] (1972), which held that the Commonwealth of Pennsylvania, although not responsible for racial discrimination voluntarily practiced by a private club, could not by law require the club to comply with its own discriminatory rules. These cases clearly rejected the notion that our prior cases permitted the imposition of Fourteenth Amendment restraints on private action by the simple device of characterizing the State's inaction as "authorization" or "encouragement." See id., at 190 [92 S.Ct., at 1979] (Brennan, J., dissenting).
Id. at 163-65, 98 S.Ct. at 1737-38 (emphasis added; footnote omitted). Accordingly, in the within case, the question arises as to whether the state involvement amounts to "mere acquiescence."
In Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), a private school, whose income was "derived primarily from public sources" and which was "regulated by public authorities" was held not to have acted under "color of state law" when it discharged certain employees. Id. at 831, 102 S.Ct. at 2766. In so doing, Chief Justice Burger wrote:
In Blum v. Yaretsky, post [457 U.S.] p. 991, 73 L.Ed.2d 534, 102 S.Ct. 2777 [(1982)], the Court analyzed the state action requirement of the Fourteenth Amendment. The Court considered whether certain nursing homes were state actors for the purpose of determining whether decisions regarding transfers of patients could be fairly attributed *221 to the State, and hence be subjected to Fourteenth Amendment due process requirements. The challenged transfers primarily involved decisions, made by physicians and nursing home administrators, to move patients from "skilled nursing facilities" to less expensive "health-related facilities." Post, at 1005 [102 S.Ct. at 2786], 73 L.Ed.2d 534. Like the New Perspectives School, the nursing homes were privately owned and operated. Post, at 1003 [102 S.Ct. at 2785], 73 L.Ed.2d 534. Relying on Flagg Brothers, Inc. v. Brooks, 436 U.S. 149 [98 S.Ct. 1729, 56 L.Ed.2d 185] (1978); Jackson v[.] Metropolitan Edison Co., 419 U.S. 345 [95 S.Ct. 449, 42 L.Ed.2d 477] (1974), Moose Lodge No. 107 v. Irvis, 407 U.S. 163 [92 S.Ct. 1965, 32 L.Ed.2d 627] (1972); and Adickes v. S.H. Kress Co., 398 U.S. 144 [90 S.Ct. 1598, 26 L.Ed.2d 142] (1970), the Court held that, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Post [457 U.S.], at 1003 [102 S.Ct. at 2785], 73 L.Ed.2d 534. In determining that the transfer decisions were not actions of the State, the Court considered each of the factors alleged by petitioners here to make the discharge decisions of the New Perspectives School fairly attributable to the State.
Id. at 839-40, 102 S.Ct. at 2770. (emphasis added). After discussing public funding, extensive state regulation, public function, and the relationship between the alleged state actor and state government, the Chief Justice held that sufficient state action was absent. In so doing, however, the Chief Justice noted:
There is no evidence that the State has attempted to avoid its constitutional duties by a sham arrangement which attempts to disguise provision of public services as acts of private parties. Cf. Evans v Newton, 382 U.S. 296 [86 S.Ct. 486, 15 L.Ed.2d 373] (1966) (private trustees appointed to manage previously public park for white persons only).
Id. at 842 n. 7, 102 S.Ct. at 2771 n. 7.
In Lugar v. Edmondson Oil Company, Inc., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), a case brought pursuant to 42 U.S.C. § 1983 to challenge a private creditor's prejudgment attachment, Justice White wrote:
In United States v Price, 383 U.S. 787, 794, n. 7 [86 S.Ct. 1152, 1156, n. 7, 16 L.Ed.2d 267] (1966), we explicitly stated that the requirements were identical: "In cases under § 1983, `under color' of law has consistently been treated as the same thing as the `state action' required under the Fourteenth Amendment."
Id. at 928, 102 S.Ct. at 2749 (footnote omitted).
As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that "most rights secured by the Constitution are protected only against infringement by governments," Flagg Brothers, 436 U.S., at 156 [98 S.Ct. at 1733]. As the Court said in Jackson v Metropolitan Edison Co. 419 U.S. 345, 349 [95 S.Ct. 449, 452, 42 L.Ed.2d 477] (1974):
In 1883, this Court in the Civil Rights Cases, 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835], affirmed the essential dichotomy set forth in [the Fourteenth] Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, "however discriminatory or wrongful," against which the Fourteenth Amendment offers no shield.
Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed. A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests. *222 Whether this is good or bad policy, it is a fundamental fact of our political order.
Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State. These cases reflect a two-part approach to this question of "fair attribution." First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. In Sniadach, Fuentes, W.T. Grant, and North Georgia, for example, a state statute provided the right to garnish or to obtain prejudgment attachment, as well as the procedure by which the rights could be exercised. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.
Although related, these two principles are not the same. They collapse into each other when the claim of constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions. See Monroe v Pape, 365 U.S. 167, 172 [81 S.Ct. 473, 476, 5 L.Ed.2d 492] (1961). The two principles diverge when the constitutional claim is directed against a party without such apparent authority, i.e., against a private party. The difference between the two inquiries is well illustrated by comparing Moose Lodge No. 107 v Irvis, 407 U.S. 163 [92 S.Ct. 1965, 32 L.Ed.2d 627] (1972), with Flagg Brothers, supra.
In Moose Lodge, the Court held that the discriminatory practices of the appellant did not violate the Equal Protection Clause because those practices did not constitute "state action." The Court focused primarily on the question of whether the admittedly discriminatory policy could in any way be ascribed to a governmental decision. The inquiry, therefore, looked to those policies adopted by the State that were applied to appellant. The Court concluded as follows:
We therefore hold, that with exception hereafter noted, the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to ... make the latter "state action" within the ambit of the Equal Protection Clause of the Fourteenth Amendment. 407 U.S., at 177 [92 S.Ct., at 1973].
In other words, the decision to discriminate could not be ascribed to any governmental decision; those governmental decisions that did affect Moose Lodge were unconnected with its discriminatory policies.
Flagg Brothers focused on the other component of the state-action principle. In that case, the warehouseman proceeded under New York Uniform Commercial Code, § 7-210, and the debtor challenged the constitutionality of that provision on the grounds that it violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Undoubtedly the State was responsible for the statute. The response of the Court, however, focused not on the terms of the statute but on the character of the defendant to the § 1983 suit: Action by a private party pursuant to this statute, without something more, was not sufficient to justify a characterization of that party as a "state actor." The Court suggested that that "something more" which would convert the private party into a state actor might vary with the circumstances of the case. This was simply a recognition that the Court has articulated a number of different factors or tests in different contexts: e.g., the "public function" test, see Terry v Adams, 345 U.S. *223 461 [73 S.Ct. 809, 97 L.Ed. 1152] (1953); Marsh v Alabama, 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265] (1946); the "state compulsion" test, see Adickes v S.H. Kress & Co. 398 U.S., at 170 [90 S.Ct., at 1615]; the "nexus" test, see Jackson v Metropolitan Edison Co. 419 U.S. 345 [95 S.Ct. 449, 42 L.Ed.2d 477] (1974); Burton v Wilmington Parking Authority, 365 U.S. 715 [81 S.Ct. 856, 6 L.Ed.2d 45] (1961); and, in the case of prejudgment attachments, a "joint action test," Flagg Brothers, 436 U.S., at 157 [98 S.Ct., at 1733]. Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here. See Burton, supra, [365 U.S.,] at 722 [81 S.Ct., at 860] ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance").
Turning to this case, the first question is whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority. The second question is whether, under the facts of this case, respondents, who are private parties, may be appropriately characterized as "state actors."
Id. at 936-39, 102 S.Ct. at 2753-54 (emphasis added; footnotes omitted).
While private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action. This is subject to constitutional restraints and properly may be addressed in a § 1983 action, if the second element of the state-action requirement is met as well.
As is clear from the discussion in Part II, we have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment. The rule in these cases is the same as that articulated in Adickes v S.H. Kress & Co., supra [398 U.S.], at 152 [90 S.Ct. at 1605], in the context of an equal protection deprivation:
"Private persons, jointly engaged with state officials in the prohibited action, are acting `under color' of law for purposes of the statute. To act `under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents," quoting United States v Price, 383 U.S., at 794 [86 S.Ct., at 1156].
The Court of Appeals erred in holding that in this context "joint participation" required something more than invoking the aid of state officials to take advantage of state-created attachment procedures. That holding is contrary to the conclusions we have reached as to the applicability of due process standards to such procedures. Whatever may be true in other contexts, this is sufficient when the State has created a system whereby state officials will attach property on the ex parte application of one party to a private dispute.
In summary, petitioner was deprived of his property through state action; respondents were, therefore, acting under color of state law in participating in that deprivation. Petitioner did present a valid cause of action under § 1983 insofar as he challenged the constitutionality of the Virginia statute; he did not insofar as he alleged only misuse or abuse of the statute.
Id. at 941-42, 102 S.Ct. at 2755-56 (footnote omitted).
Herein, there is no evidence that Frederick County's Zoning Administrator or any County deputy sheriff or any police officer of the State of Maryland established, or approved of, the Klan's racially discriminatory exclusionary practices. But the County and the State, because of a perceived and seemingly existing need to establish reasonable controls in connection with public rallies on private property, enacted in 1981 an ordinance requiring that a permit *224 be issued before any such rally could be held. After each permit has been issued under that ordinance to the Klan, law enforcement officers of the State of Maryland and of Frederick County have combined their activities to insure the appropriate handling of automobile traffic proceeding to, and peaceful conduct at, each rally site. Those needs caused county deputy sheriffs and state police to be on hand at the private property involved. The Administrator issued each permit pursuant to the 1981 ordinance either with knowledge that the particular rally would be closed to blacks and to non-gentiles, or that each prior Klan rally held pursuant to such a permit had been so closed. Further, at least after the first rally, the Administrator knew or seemingly should have known that each subsequent rally would quite likely require police supervision at and near the rally property before, during and after the rally to assure traffic control and peaceful conduct. The Administrator's issuance of a permit was but one step in the coordinated governmental chain of action which began when the County enacted the ordinance, the Zoning Administrator issued the permit, and the State police and county deputy sheriffs performed their functions at and near the rally. Thus, there clearly was governmental involvement. The question is whether or not such involvement is significantly sufficient to constitute "state action". The governmental involvement herein was not the same as the governmental involvement in Griffin v. Maryland in which the amusement Park's bouncer acted as a county deputy, and criminal prosecution followed. Here there was no eviction from the private property by a county deputy sheriff nor by any state policeman, nor any arrest or criminal prosecution. In addition, there did not exist herein the same type of governmental involvement as in Moose Lodge, in which the state liquor control statute required the licensee to abide by its own constitution and by-laws  documents which called for exclusion of black guests. In this case, the Klan seemingly could, at any time, have changed its mind and have permitted blacks and non-gentiles to come on the private property and to attend the rally. The Klan, if it had permitted such attendance, would not have violated any law or any provision of a permit. But the case law teaches that there is no single litmus-type test in a given case for determination of presence, vel non, of state action. Words like "significant state action," "sufficient state action," "nexus" and the like abound in the case law. It is not necessary to subscribe to the "balancing approach" suggested by Judge Young in Edwards v. Maryland State Fair and Agricultural Society, 476 F.Supp. 153 (D.Md.1979), modified, 628 F.2d 282 (4th Cir.1980)  although that approach may, in a given case, not only have considerable appeal but also provide helpful guidance  in order to recognize that it is the specific factual circumstances which determine whether state action is present in a given case.
This case is concerned with racial discrimination, not "private commercial transactions" as in Flagg, 436 U.S. at 163, 98 S.Ct. at 1737. Also, while "significant encouragement, overt or covert" of an affirmative type is absent, the within litigation does involve passive supervision and toleration by state and county law enforcement officers of physical exclusion of blacks, from the rally site, by Klan  directed personnel. "Because of the generally recognized anathematic status of any government  sponsored racial discrimination ..., we have held that a lesser degree of state involvement is needed to meet the state action requirement in cases alleging such discrimination." Taylor v. Consolidated Edison Co. of New York, Inc., 552 F.2d 39, 42 (2d Cir.1977) (citations omitted). "The level of state action may be de minimis when racial discrimination is alleged because the hallmark of the Fourteenth Amendment has been to safeguard against discrimination based on race. See e.g. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)." Curtis v. Rosso & Mastracco, Inc., 413 F.Supp. 804, 807 (E.D.Va.1976). *225 Herein, "the level of state action" is considerably more than de minimis.
What emerges from a consideration of the facts and the issues in this case is the realization that local and state government can allow public rallies on private property to be held without any governmental regulation, or perhaps can, if public safety considerations sufficiently require in certain instances, ban the same entirely, or can authorize the same to take place under a permit system which entitles all members of the public, regardless of color or creed, to attend. But here, government has brought into being a permit system which the Klan has used to cause certain members of the public to be excluded from public rallies on private property because of race or religion. In essence, government has looked the other way while a racially discriminatory result has been originated and accomplished by private actors who have been subject to governmental supervision.
In this context, "the necessarily fact-based inquiry that confronts [this] Court", Lugar, 457 U.S. at 939, 102 S.Ct. at 2755, requires, in the opinion of this Court, the conclusion that sufficiently significant state action is present. Accordingly, the Administrator will be enjoined from issuing a permit under Section 1-19-213 of the Frederick County Zoning Ordinance for the holding of any public rally on private property, located in Frederick County, if the Administrator knows, or has cause to know, that the applicant for such permit proposes to exclude from such rally members of the public because of their race. This Court is today issuing an Order to that effect.
NOTES
[1] Ms. Evans-Anderson was not an original plaintiff. The original plaintiffs (NAACP and Nickens) and Ms. Evans-Anderson were permitted, over the objection of defendant, to add the latter, by amended complaint, as a plaintiff herein. See n. 7 infra.
[2] The original defendant was Frederick J. Lowndes who was the Zoning Administrator of the County when this suit was instituted. During the pendency of this case, several documents filed by defendant revealed that Mr. Lowndes had been succeeded as Zoning Administrator by Michael C. Thompson. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), this Court substituted Mr. Thompson as defendant herein.
[3] See n. 1 supra.
[4] See n. 7 infra.
[5] While the parties have so stipulated, the record seemingly indicates that the said condition appears in the permits for the rallies held June 28, 1980, October 18, 1980, April 4, 1981, September 19, 1981 and July 25, 1981 but not in the permit issued June 12, 1985.
[6] There are pending in this case cross-motions for summary judgment. However, there seem to be no relevant and material facts which are in dispute. Accordingly, only legal issues are presented for determination by this Court herein.
[7] During on the record hearings defendant seemingly, at one or more times, conceded that the then plaintiffs had standing. However, subsequently, in written and oral presentations, defendants apparently raised the standing issue. In any event, because it is incumbent upon this Court to inquire concerning that issue of standing, this Court so did. Thereafter, plaintiffs sought and were granted permission, over defendant's objections, to amend plaintiffs' complaint to add an additional party plaintiff and to state further allegations. Such grant by this Court was based upon the liberal, flexible policies underlying Federal Civil Rule 15. See also Justice Stewart's specific statement in the majority opinion authored by him in Sierra Club v. Morton, 405 U.S. 727, 735 n. 8, 92 S.Ct. 1361, 1366 n. 8, 31 L.Ed.2d 636 (1972), that "[o]ur decision [that standing was lacking] does not, of course, bar the Sierra Club from seeking in the District Court to amend its complaint by a motion under Rule 15, Federal Rules of Civil Procedure." Thereafter, in Sierra Club, on remand, the District Court "allowed plaintiffs to make further allegations concerning standing; and to add certain additional parties; and, also, to add a third claim for relief...." Sierra Club v. Morton, 348 F.Supp. 219, 220 (N.D.Cal.1972).
[8] While certain of the applications for permits, during the last several years, to hold Klan rallies on private property in Frederick County indicated discrimination on religious as well as racial grounds, it is the latter which has been stressed by plaintiffs.
[9] Judge Winter's factual statement was based on a stipulation of the parties:

The party distributed leaflets which purported to invite only whites. But it is stipulated that "no member of the Negro race and/or Jewish religion has been or would be, purposely excluded from attendence or participation in a public meeting called by the Party. Public meetings of the Party have been attended by members of the Negro race and/or the Jewish religion."
Id. at 1018 n. 16. In dissent, Judge Butzner commented:
The Board's action should be judged on the facts then before it, not on the Party's subsequent stipulation to the effect that it didn't mean what it said. Despite its subsequent self-serving declaration that Jews and Negroes could have attended the meeting the Party remains insistent that Negroes are barred from membership. Consequently, they can not attend the private meetings in the school that the opinion of the court authorizes.
Id. at 1020 n. 1.